1
ROBERT M. MYERS
VALERIE VANAMAN
2
Newman.Aaronson.Vanaman
14001 Ventura Boulevard
3
Los Angeles, California 91423
(818) 990-7722
4

MARK ROSENBAUM
5
SILVIA ARGUETA
ACLU Foundation of Southern California
6
1616 Beverly Boulevard
Los Angeles, California 90026
7
(213) 977-9500

8
CATHERINE BLAKEMORE
SANDRA PETTIT
9
Protection & Advocacy, Inc.
221 East Glenoaks Boulevard, Suite 220
10
Glendale, California 91207
(818) 546-1631
11

Attorneys for Plaintiffs
12

13

14
UNITED STATES DISTRICT COURT

15
CENTRAL DISTRICT OF CALIFORNIA

16

| | | |
|---|---|---|
| 17 CHANDA SMITH, et al., | ) | CASE NO. CV 93-7044 LEW(GHKx) |
| 18     Plaintiffs, | ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE CONSENT DECREE |
| 19     vs. | ) | |
| 20 LOS ANGELES UNIFIED SCHOOL DISTRICT, et al., | ) | Date: April 15, 1996 |
| 21     Defendants. | ) | Time: 9:00 a.m. |
| 22 | ) | |

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    FACTS LEADING UP TO DRAFTING OF CONSENT DECREE . . . . . . . . . 1

    A.    Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Independent Expert Consultants  . . . . . . . . . . . . . . . . . . . . 2

    C.    Objectives and Methodology of the Consultants' Investigation  . . . . . . . . 4

    D.    The Consultants' Findings  . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E.    The Consultants' Recommendations  . . . . . . . . . . . . . . . . . . . . . 9

II.   CONSENT DECREE  . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Consent Decree, Conditionally-Accepted . . . . . . . . . . . . . . . . . 12

        1.    Terms of the Decree  . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    Revised Consent Decree  . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.    Public hearings and response  . . . . . . . . . . . . . . . . . . . . . 16

        2.    Modifications to the Decree  . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    A CONSENT DECREE IS REVIEWED TO DETERMINE WHETHER THE SETTLEMENT ACHIEVED IS FUNDAMENTALLY FAIR, ADEQUATE AND REASONABLE  . . . . . . . . . . . . . . . . . . . . . . . . 24

II.   THE CONSENT DECREE IS FUNDAMENTALLY FAIR  . . . . . . . . . . . . 25

III.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                    **Page(s)**

3

Davis v. City and County of San Francisco,
4          890 F.2d 1438 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5   Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco,
           688 F.2d 615 (9th Cir. 1982),
6          cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) . . . . . . . . 24

7   City of Detroit v. Grinnell Corp.,
           495 F.2d 488 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

8
United States v. State of Oregon,
9          913 F.2d 576 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      **FACTS LEADING UP TO DRAFTING OF CONSENT DECREE**

A.      **Background**

Plaintiffs filed this class action lawsuit in November, 1993 on behalf of students with disabilities, alleging that the Los Angeles Unified School District had failed and was continuing to fail to comply with its special education obligations pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and the equal protection clause of the Fourteenth Amendment. The suit specifically alleged that the District has pervasively and continuously failed to search for, identify, track, and timely and properly serve the educational needs of children with disabilities.

Litigation did not follow the usual course. The parties quickly sought to resolve the case in a manner that expeditiously directed energies and resources into assuring compliance with the law, rather than pursuing adversarial discovery, trial and appeal. By mutual agreement, nationally-respected independent expert consultants ("Consultants") were retained to investigate the issues, enter findings concerning the District's compliance with special education laws, and make non-binding recommendations as to steps the District would be required to undertake to meaningfully improve services to students with disabilities in conformity with its legal obligations. The parties would then proceed to review and comment on the findings and recommendations, obtain input from class members, their families and individuals knowledgeable about special education and conclude a final settlement agreement. The parties did not confine the Consultants' examination. They were instructed to review, analyze and make recommendations relating to all District special education policies, forms, procedures, practices, operations and any internal administrative mechanisms essential to establish compliance with applicable laws and regulations. The terms of the agreement were incorporated into an Interim Settlement Agreement which was filed with this Court and subsequently approved on October 3, 1994. A second amended complaint was filed with the Court on June 20, 1995, alleging that "thousands of children are being deprived of the free appropriate public education because of the LAUSD's pervasive, substantial and systemic

-1-

inability to comply with IDEA and Section 504." The parties periodically briefed the Court and made appropriate filings as to all principal developments in the litigation.

**B.     Independent Expert Consultants**

The parties sought the involvement of independent experts possessing nationally-regarded qualifications and extensive experience with respect to the delivery of special education services in large, urban, multi-cultural and multi-linguistic school districts. The following minimum qualifications were defined in the Interim Settlement Agreement for each expert:

1.     Familiarity with the relevant federal and California statutes and regulations concerning the identification and provision of special education services to students with disabilities; and

2.     Substantial practical or field experience designing and implementing programs or systems for the identification and provision of special education instruction and/or services to students with disabilities. The expert nominees were also required to have successfully designed and implemented such a program in at least one large, urban school district with varied cultural and linguistic needs other than the Los Angeles Unified School District.

After a nationwide search for experts was conducted by both parties, each side asked the other to agree to the appointment of its first choice. The parties agreed to this procedure. The Consultant teams were thereupon retained in December 1994 and commenced work on the project in January 1995. The credentials and experience of the Consultant team members are described at pages 32-39 of the Consultant's Report submitted in October 1995 and at exhibits 2 and 3 of the accompanying Appendix of exhibits. We briefly review the qualifications of plaintiffs' lead expert, Dr. Mary Margaret Kerr, and of the District's lead expert, Dr. Louis Barber. Between them, Dr. Kerr and Dr. Barber have provided special and general education consulting services to many multi-ethnic school districts, including, for example, New York, Pittsburgh, San Diego, Cincinnati and Nashville.

Dr. Kerr is Associate Professor of Child Psychiatry, Special Education, and Counselor Education at the University of Pittsburgh and Director of School and Community Outreach for the University's School of Medicine. She has lectured, written and published extensively on special education issues, and is one of a small number of academics across the country with substantial hands-on experience in school district management and operations. Dr. Kerr has headed public school projects in general education, special education and student support services for the United States Department of Education, the Commonwealth of Pennsylvania Office of Mental Health, the Pennsylvania Department of Education, the Pittsburgh Public Schools, and the William T. Grant Foundation, among others. She has served as a consultant to state departments of education, special education agencies, and school districts throughout the country.

Dr. Louis Barber is President of Lou Barber and Associates, a consulting firm that has provided advice on special education matters for numerous school districts throughout the country, including the New York City Department of Education, San Diego Unified School District, Fresno Unified School District, and the Orange County Consortium for Special Education and Special Education Local Plan Areas, covering the counties of Alameda, Calaveras, Colusa, Madera, Marin, Mariposa, Orange, Placer and San Mateo. From September 1992 through August 1995, Dr. Barber was Administrator of Special Education for the Sacramento City Unified School District. His experience encompasses almost all aspects of education, ranging from service as a teacher and principal, community college director of extension education, director of special education schools and services, assistant superintendent for special education at the elementary and high school levels, staff member U.S. Department of Education for the Assistant Secretary for Special Education and Rehabilitation, Assistant Superintendent of Public Instruction and Director of Special Education for the California State Department of Education, and as a member of the Board of Trustees of the El Dorado Union High School District. As the Director of Special Education for the State of California, Dr. Barber was intimately involved in the development

1  of much of California's current legal, regulatory, budgetary and funding apparatuses

2  governing special education.

3

4  **C.      Objectives and Methodology of the Consultants' Investigation**

5         The Interim Settlement Agreement mandated the Consultants to evaluate the District's

6  delivery of special education services relative to compliance with all federal and state statutes

7  and regulations affecting students with disabilities.   They were specifically tasked with

8  reviewing, analyzing and submitting recommendations with respect to:

9         1.      The sufficiency of the District's special education policies, procedures, practices,

10  and forms;

11        2.      The question of whether the District has been over identifying students with

12  disabilities from any ethnic group;

13        3.      The sufficiency of the District's policies and procedures for identifying and

14  deferring for assessment and service those students who may have disabilities;

15        4.      The sufficiency of the District's policies and procedures for ensuring continuous

16  special education services to students with disabilities as they enroll in the District from other

17  school districts, change schools or otherwise matriculate from elementary to middle to

18  secondary schools within the District;

19        5.      The sufficiency of training or in-service for District personnel on special

20  education policies, procedures, and due process;

21        6.      Methods for ensuring implementation of and accountability for the District's

22  special education policies and procedures at all school sites;

23        7.      Internal administrative structures to ensure the District's consistent and full

24  compliance with applicable special education laws and regulations at all levels; and

25        8.      Any other areas agreed to by the parties.

26        The efforts of the Consultants' teams were undertaken as a cooperative venture in

27  order to facilitate fact-finding and prevent duplication of work.   After meeting with the

28  parties, the Consultants jointly drew up assignments for primary responsibilities for particular

1   tasks.  Each team was continuously informed of the other team's examination and analyses;

2   documents requested and obtained were shared.

3       The Consultants' Report contains a partial listing of the documents reviewed by the

4   Consultants and their teams.  They include:

5           - a complete set of the District's special education policy bulletins, procedures

6               and memoranda;

7           - general education and special education forms;

8           - the District's special education budget, including the State of California J-50

9               special education budget and J-380 special education

10              expense forms;

11          - special education in-service materials;

12          - actual records of students with disabilities, for purposes of assessing, among

13              other objectives, the quality and timeliness of assessments, and

14              appropriateness of recommended services and placements; and

15          - compliance materials, technical data, statistics and reports prepared by

16              others, including a 1993 Blue Ribbon Committee on the sufficiency of

17              the District's student support services and a 1993 Arthur Anderson

18              report.

19      Interviews and, on occasions, focus groups were extensively conducted.  Discussions

20  involved parents of students with disabilities and a broad range of District personnel,

21  including, for example, Assistant Superintendent of Operations Daniel Isaac, Assistant

22  Superintendent of Student Support Services Sara A. Coughlin, Special Education Division

23  Director Beverly G. Watkins, Psychological Services Director Loeb Aronin, Division of

24  special Education Student Services Coordinator Shirley Brown, Division of Special Education

25  Administrative Coordinator Stephen Mark, Director of Budget Services Mark Schrager,

26  Division of Special Education Principal Financial Analyst Ken Furuya, Special Education

27  Student Assignment and Coordination ("SESAC") Report Specialist Wayne Foglesong,

28

1   District Equal Opportunity Coordinator Deanne Neiman, and Information Technology

2   Department Director John Nagata and his senior administrative staff.

3        The Consultants also interviewed the District's six unit coordinators, coordinators of

4   psychological services, cluster leaders, general and special school principals, senior

5   psychologists, school psychologists, program specialists, school counselors, school office

6   administrators and clerical personnel, as well as solicited input from approximately 1500

7   parents with children attending extended school year programs.  The focus groups convened

8   consisted of: (1) all of the District's cluster leaders; (2) all special education unit

9   coordinators; (3) elementary, middle school and high school principals; (4) general and

10   special education teachers; and (5) school office personnel.

11        The Consultants inspected both general and special education sites, facilities and

12   classrooms and interviewed personnel at these sites.  Visits and interviews at a sampling of

13   non-public school sites were also undertaken.  One team met with or reviewed data from

14   special education administrators and staff at other California school districts, including San

15   Francisco, Oakland, San Diego, Long Beach, Sacramento, Fresno and San Juan.

16

17   **D.    The Consultants' Findings**

18        The Consultant teams conducted their assessment over a ten month period.  Their

19   Report was filed in October 1995 and, as mandated in the Interim Settlement Agreement,

20   included recommendations regarding internal administrative mechanisms to assure that the

21   District: (a) implements all corrective actions agreed to by the parties; and (b) thereafter

22   remains in compliance with all laws affecting students with disabilities.

23        The Report was 191 pages in length, and was accompanied by an Appendix of exhibits.

24   It reflected the joint conclusions and analyses of the expert teams without any disagreement

25   whatsoever.  The documents were filed with the Court on October 31, 1995.

26        The Consultants concluded that "the District suffers from a pervasive, substantial and

27   systemic inability to deliver special education services in compliance with special education

28

laws." (Report, pp. 3-6, 52-172.)  The Report identified the "root causes of this dysfunction" as deriving from "three major factors:"

First, when the District articulates and implements its educational mission it systematically and repeatedly fails to take into account its particular obligation to serve students with disabilities.

Second, the District is permeated with long standing traditions and well-entrenched practices that marginalize the delivery of special education programs and services.  Among other things, this includes a systemic failure to recognize that the education of students with disabilities is the responsibility of the entire District -- general education as well as special education.

Third, while there are District personnel making good faith efforts, there is no District structure or internal oversight mechanism to ensure that special education programs and services are governed, managed and operated in compliance with the law.  There are serious limitations with respect to accountability for the timely and appropriate delivery of special education services.  At the same time, many administrators, field personnel, teachers and staff -- unaware of their obligations concerning compliance -- engage in substantial and repeated violations of laws for which they are not held accountable.

(Report, pp. 3-4, 55-79.)

As direct consequence of these failings, the Consultants identified the following eleven areas of District non-compliance with applicable laws and regulations:

1.     The District does not make a sufficient effort to search for, identify and serve eligible students with disabilities;

2.     The District fails to identify, assess and serve students with disabilities within the timelines set by law;

3.     The District's Designated Instructional Services are not operated in compliance with special education timelines and caseload limitations.

4.    The District has failed to provide effective staff development to ensure that all District personnel can execute their obligations under the law to students with disabilities;

5.    The District cannot readily track its students or their educational history and is not otherwise in compliance with respect to the maintenance of and access to student records;

6.    The District cannot resolve issues involving the disproportionate identification (over and under) of students by ethnicity;

7.    The District is not in compliance with respect to ensuring the meaningful representation, participation and informed consent of parents;

8.    The District lacks the structure and mechanisms to ensure compliance with the legal mandates concerning least restrictive environment;

9.    The District lacks a mechanism for planning, developing and maintaining a comprehensive focus on matriculation, facilities, transportation and transition concerns;

10.    The District's personnel policies and practices result in substantial and repeated failure to deliver special education services, as required by law; and

11.    The District is not in compliance with respect to the administrative and managerial allocation of special education resources.

(Report, pp. 4-6, 79-172.)

The Consultants concluded with respect to these findings that "[a] school district out of compliance is off course and cannot, as a professional matter, claim to be meeting the educational needs of its students with disabilities."  (Report, p. 6.)  They characterized the consequences of this non-compliance as "severe":

They are most immediately felt by students with disabilities who often suffer substantial and permanent injury from lost time learning, continued isolation and marginalization, and loss of services absolutely essential to their health and growth.  The harm suffered by children with disabilities, their parents and their

1  communities as a result of systemic non-compliance is incalculable, tragic and

2  unacceptable.

3  (Report, p. 7.)

4  Notwithstanding the "serious[ness] [of] the District's compliance deficiencies"

5  identified, the Consultants determined that

6  they can be corrected within a reasonable period of time by: (a) making

7  compliance with special education laws an absolute priority; (b) reinstating

8  sound budgeting, management and personnel principles, policies and practices;

9  (c) using readily available and proven technologies to return to and remain in

10  compliance and efficiently manage the delivery of special education services.

11  (Report, p. 8.)

12

13  **E.      The Consultants' Recommendations**

14  The Consultants concluded that "[t]he extent and systemic nature of the District's non-

15  compliance requires a comprehensive set of recommendations to ensure a return to

16  compliance."   (Report, p. 8.)   They jointly prepared twenty-six carefully detailed

17  recommendations, all of which they determined as "required for compliance." (Report, p. 8.)

18  We quote or excerpt from the Consultants' recommendations below:

19  1.     The Board of Education and Superintendent must: (a) articulate a commitment

20  to serve the needs of students with disabilities as required by law; (b) ensure that District policies and procedures designed to carry out this commitment are disseminated not only to every school site, but also to all personnel affected by or

21  charged with carrying out such policies and procedures; and (c) ensure that such policies and practices are implemented and enforced.

22

23  2.     The District's top special education administrator must have the title and authority of an assistant superintendent commensurate with those administrators providing comparable direction and support to the District's general education

24  programs.

25  3.     The administration of special education services must be consolidated and restructured to ensure compliance with the law at all levels in the delivery of services

26  to children with disabilities.

27  4.     The District must revise and update its special education policies, procedures, practices and forms relating to the delivery of special education services in general,

28  including its "search and serve" obligations under the law.

5.     The District must also review its Speech and Language Services to bring it into compliance with respect to the caseloads for speech and language specialists including the number of personnel providing coordinating services.  The District also needs to ensure that all IEP meetings are conducted with appropriate staff in attendance, including an administrator or administrative designee.

6.     The District must review its Local plan to ensure that all of its provisions are consistent with the requirements of California and Federal special education laws and regulations.

7.     The District must ensure implementation of Behavioral Intervention Plans for all students in need of such strategies consistent with the purpose and requirements of the Hughes Bill.

8.     The District must conduct occupational and physical therapy assessments within timeliness as required by law.  The District must also ensure the timely delivery of occupational and physical therapy to all students whose IEPs indicate that such services are appropriate.

9.     The District must ensure that IEPs for NPS students placed in dual programs are implemented in a timely manner.  The District must also review and develop policies and procedures regarding dual programs to ensure appropriate delivery of services.

10.     The District must review and revise its policies and procedures with respect to student discipline, including but not limited to suspensions, expulsions, and intra-district transfers (including "opportunity transfers").

11.     The District must ensure that Section 504 of the Rehabilitation Act, special education procedures under IDEA, and state law are coordinated at the school site level and communicated effectively to parents and school personnel.

12.     The District must establish and operate Student Study Teams or their equivalent at every school site in the District.  The District must also ensure that Student Study Teams, or their equivalents, review the educational program and needs of every student referred to them on a timely basis and operate in accordance with procedures established by the District.

13.     The Consultants wish to emphasize that the sine qua non to returning the District to compliance with special education laws and regulations lies in: (1) centralizing and computerizing all educational records of all District students; and (2) developing and installing a comprehensive special education management information system.

14.     The District must provide families with the information they need to effectively support the education of a child with disabilities.

15.     The District must in-service the Board of Education, the Superintendent, all administrators, and all other certificated and classified personnel on the legal and professional obligations to students with disabilities under the law on a regular basis.

16.     The District must develop and implement programs and services for students with disabilities which emphasize the education of all students in the least restrictive environment.

-10-

17.     The District must ensure that special education students are not discriminated against in their access to, and that a full continuum of special education services is provided by, School Based Coordination Act schools, magnet schools, and LEARN schools.

18.     The District must . . . comply with the mandate of least restrictive environment.

19.     The District must design and develop a plan that ensures special education students are fairly, adequately and appropriately served with respect to facility allocations of space, transportation services, student transfers, suspensions and expulsions, matriculation, feeder patterns, and the continuum of special education programs and services.

20.     The District needs to make a commitment for the provision of adequate and appropriate space for special education programs and services at every school site.

21.     With respect to transportation issues the District should review the current length of time that students ride school buses, as well as the length of time that students may sit on school buses after arrival at school sites in order to ensure that students do not spend too lengthy a time waiting to begin their school program.  In addition, transportation should be reviewed with respect to the Least Restrictive Environment and that programs are offered on campuses close to students' homes. The District must also ensure that information concerning the District's Dispute Resolution Procedures for Transportation Issues is included within information disseminated to parents and others on an annual basis.

22.     With respect to transition issues in particular, the Consultants concur with the recommendation made by the 1993 Blue Ribbon Committee that the District should implement a:

> ". . . mechanism for planning, developing, and maintaining a comprehensive focus on transition concerns.  Examples of focus include concerns about (a) welcoming and providing social support for new arrivals, (b) before and after school activity, (c) articulation in moving to the next level of schooling, (d) vocational and college counseling, (e) transition into or out of special education, and (f) transition to post school living."

23.     The District must revise its personnel policies and practices to ensure the accountability of all personnel for consistent compliance with special education laws.

24.     The District must revise its personnel policies and practices to ensure an adequate number appropriately qualified special education staff and devise and implement practices that ensure the appropriate utilization of substitutes.

25.     The District must review the allocation of resources to ensure the availability of appropriate programs and services to students with exceptional needs.

26.     The District must review its special education budgeting practices and audit its special education finances and programs on an on-going basis.

-11-

## II.    CONSENT DECREE

### A.    Consent Decree, Conditionally-Accepted

Upon receipt of the Consultants' Findings and Recommendations, the parties prepared a fifty-eight page draft Consent Decree and Order to be subjected to public hearing and comment as provided in the Interim Settlement Agreement.  Copies were shared with the District's bargaining units for psychologists and teachers, and administrators, respectively. The Board voted to conditionally approve this Decree on December 11, 1995, and public hearings were accordingly set for the afternoon of January 29 at the Board's downtown headquarters, in the evenings of January 31 and 31 at Birmingham High School in the San Fernando Valley, and at Banneker Special Education Center respectively.  The conditionally-approved Decree was filed with the Court on December 14, 1995.

### 1.    Terms of the Decree

The principal section of the draft Decree enunciated the District's commitment to implement fully each of the twenty-six recommendations set forth in the Consultants' Report. (Decree, section II, pp. 4-20) ("The Consultants' Report set forth a series of recommendations the District <u>must</u> take to return to and maintain compliance with special education laws and regulations.  The District hereby agrees and commits that it will implement those recommendations. . . ." (emphasis added).)  The recommendations were individually described and the Board specifically pronounced its obligation to carry out each and all of them.  (<u>Id</u>.)  They were grouped into fourteen subject areas:

- Recommendations Relating to the Board of Education and Superintendent (Decree, p. 4);

- Recommendations Relating to the Leadership of the Special Education Division (Decree, pp. 4-5);

- Recommendations Relating to the Administration and Restructuring of Special Education and Related Services (Decree, pp. 6-7);

- Recommendations Relating to the Special Education Policies, Procedures, Practices and Forms (Decree, pp. 7-9);

1          -      Recommendations Relating to Student Study Teams (Decree, p. 9);

2          -      Recommendations Relating to the Computerization of Student Records

3                 and tracking of Students with Disabilities (Decree, pp. 9-11);

4          -      Recommendations Relating to Parent Participation (Decree, p. 12);

5          -      Recommendations Relating to Staff Development (Decree, p. 12);

6          -      Recommendations Relating to Delivery of Special Education and

7                 Related Services in the Least Restrictive Environment (Decree, pp. 13-

8                 14);

9          -      Recommendations Relating to Matriculation, Facilities, Transportation,

10                Continuum of Services and Transition Issues (Decree, pp. 14-15);

11         -      Recommendations to Ensure that District Personnel Deliver Special

12                Education and Related Services in Compliance with Special education

13                Laws (Decree, pp. 15);

14         -      Recommendations Relating to the Number of Appropriately Qualified

15                Special Education Staff (Decree, pp. 16-17);

16         -      Recommendations Relating to the Allocation of Resources (Decree, pp.

17                17-18); and

18         -      Recommendations Relating to the District's Special Education Budget

19                and Finances (Decree, pp. 19-20).

20         In Section III of the conditionally-approved Decree, "Surviving Conditions of the

21   Interim Settlement Agreement," the District agreed to implement detailed procedures for the

22   identification of students with disabilities: (a) moving into the District from another school

23   district (Decree, pp. 22-24); (b) transferring from one district school to another district school

24   (Decree, pp. 24-25); and (c) enrolled in regular education classes of the District (Decree, pp.

25   29-30).   The same section also defined those procedures to be implemented by the District

26   relating to the removal of students with disabilities from special education or related services.

27   (Decree, pp. 26-29.)   The procedures articulated require the District to revise enrollment

28   forms and policies, train all personnel likely to participate in student enrollment in the

1  revised procedures and take affirmative steps to ascertain whether Individual Education Plans

2  ("IEP's") exist for students from prior districts and schools.  Where a prior IEP is identified,

3  the Decree provides that the District will institute comparable programs until new

4  appropriate assessments or reviews have been conducted, or supply parents with written

5  reasons as to why it believes an assessment is unwarranted, along with notice and opportunity

6  to appeal the decision.  It also assures that all parents will be afforded information and the

7  opportunity to request assessments.   The District is further mandated to develop an

8  appropriate and annually-required training program for school psychologists and regular

9  classroom teachers with regard to the identification of students who may require special

10  education services.

11      Section IV of the Decree, "Procedures for Planning Implementation of the

12  Consultants' Recommendations and the Surviving Conditions of the Interim Settlement

13  Agreement," reflected the parties' intent that the relief required to bring the District into

14  compliance be prescribed and monitored by independent experts.  (Decree, pp. 31-43.)  It

15  accordingly caused the appointment of two consent decree administrators, identified as

16  Consultants Kerr and Barber, charged with the following responsibilities:

17      (1)  develop plans to implement the Consultants' recommendations and

18      surviving terms and conditions of the Interim Settlement Agreement set forth

19      in this Consent Decree in Sections II and III above; (2) oversee the District's

20      implementation of such plans; (3) assist in the administration of the District's

21      special education programs and operations; and (4) monitor the District's

22      return to compliance with special education laws and regulations.

23  (Decree, p. 31.)

24      As part of these duties, the conditionally-approved Decree directed that these

25  Administrators "shall develop a process to ensure public participation in the development of

26  all implementation plans," including the formation of committees consisting of parents,

27  teachers, administrators and other interested parties.  (Decree, p. 37.)  Procedures were also

28  set out for the approval of implementation plans and budgets by the Board; opportunity for

plaintiffs to have notice and opportunity to review and make objections, and for the administrators to effect revisions; and for referral to the Court where either party objects to a resubmitted plan or budget by the Administrators.  (Decree, pp. 39-43.)

Timelines for implementation of the draft Decree were set in Section VI, "Implementation of Consent Decree."  (Decree, pp. 45-47.)  All actions required were accordingly to be implemented within five years from the date the Court approves the Consent Decree, and the Administrators were directed to deliver a specific timeline for implementation of all actions required within thirty days of the approval.  (Decree, p. 46.)

### 2.   Notice

Pursuant to the Interim Settlement Agreement and Stipulation and Order concerning notice approved by this Court on December 14, 1995, the parties subjected the document to extensive public review and comment once the Board voted conditional approval of the draft Consent decree.  The efforts undertaken to accomplish public scrutiny were unprecedented. They included:

> - first class mailing to the families of students with disabilities, whose addresses were available to the District, of a 32 page 8 1/2" x 11" booklet notifying parents about the draft Decree and the convening of public hearings.[1]
>
> The booklet was printed in both English and Spanish.  The cover and back pages were identical: the print appeared in red and black, and white against a red background; they were translated into eight languages.  The word URGENT! appeared at the top of each of these pages in each language.  The English and Spanish message printed in red ink read: "Enclosed is important information about your child's education.  Please read this today."  The cover and back page messages in the six remaining languages read as follows: informed parents how to obtain information about the Decree in their native language.

---

[1] A copy of the booklet is attached to these papers as Exhibit 1.

Inside the booklet were: a letter to parents from plaintiffs' counsel summarizing the litigation and the findings of the Consultants, and emphasizing the importance of parental review and comment on the Decree; a set of questions and answers about the lawsuit, spelling out the findings, the nature of the recommendations made and explaining how parents can participate in the development of solutions and obtain by telephone a copy of the Consultants' Report and draft Decree; a notice to class of the proposed consent decree, signed by the Court on december 14, 1995; and a parent survey and addressed envelope to the District, seeking parental input in a number of ways. The booklet twice listed the schedule and location of public hearings on the Decree.

- publication of the Notice to Class in the Metro section of the Los Angeles Times and in La Opinion, Los Angeles Sentinel, Korea Times, Chinese Daily News, Saigon Times, Philippine News, Asbarez Daily and the Los Angeles Daily News.

- every child in a special education class received an information packet to take home.

In addition, counsel and advocates undertook massive efforts to supplement these notice procedures, respond to class members' inquiries and concerns, and create widespread awareness about the Report and the Decree within the disability community and the public at large. See declarations of Robert Myers, Susan Simpson, Brigitte Ammons, attached jointly as Exhibit 2.

**B.    Revised Consent Decree**

    **1.    Public hearings and response**

Public hearings on the draft Decree took place on January 29 at District headquarters from 1 to 5 p.m.; on January 30 at Birmingham High School in Van Nuys from 5 to 9 p.m.; and on January 31 at Banneker Special Education Center on South San Pedro Street, also from 5 to 9 p.m. More than 200 parents and community members testified before the Board;

1   counsel for plaintiffs, the Consultants and members of their teams, and officials and staff in

2   the area of special education were also present.[2]  The hearings were televised on Channel

3   58, the District's cable station, and received widespread media coverage.

4       More than 3800 parent survey responses were mailed to the District, and turned over

5   to plaintiffs' counsel.  The responses were reviewed and entered into data summaries.  Efforts

6   were undertaken by plaintiffs to telephone each respondent in order to provide additional

7   notice of the hearings and solicit further input.  Many, if not most of the responses, included

8   comments about the delivery of special education services by the District.

9       Counsel and paralegals for plaintiffs, as well as parent advocates hired by plaintiffs,

10  engaged in aggressive outreach to ascertain the viewpoints of parents, disability and

11  community groups, teachers and administrators, and experts in the area of special education.

12  See declarations attached as Exhibit 2.

13      There were two principal concerns enunciated about the draft Decree.  First, many

14  parents and some teachers described the existence of insensitive and non-supportive general

15  education campuses for children with disabilities in comparison to nurturing environments

16  at school sites devoted exclusively to delivering special education services.  These latter sites

17  were praised in numerous instances as including faculty and staff better trained to understand

18  the pedagogy of instruction and encouragement for students with disabilities.  This testimony

19  sought assurances that these sites, where approximately 10% of the disabled student

20  population (some 6000 students) now receives instruction, would not be closed, and that a

21  complete range of educational options be made available, extending from such campuses to

22  the opportunity to attend general education campuses and receive comparable instruction and

23  services in a supportive environment.

24      Second, many parents testified to District non-responsiveness and an uncaring attitude

25  toward the needs of their children over an extended period.  These parents recommended

26  modifications to the draft Decree to assure meaningful participation of parents and

27

28

---

[2]  Transcripts of each day's hearings are attached to papers filed by the District.

1  experienced advocacy groups in the development of implementation plans and the monitoring

2  process.

3      **2.**    **Modifications to the Decree**

4      Counsel for the parties reviewed all of the public comment.  Revisions to the Decree

5  were accordingly entered, and agreed to by the parties.  Two days of additional public

6  hearings before the Board on the proposed modifications were convened, and further changes

7  made.

8      The Consent Decree filed with the Court on March 18, 1996 reflects the parties' best

9  efforts to amend or add provisions sensitive to the input by families of the class members and

10  others knowledgeable about education for students with disabilities.  We have attached as

11  Exhibit 3 a copy of the revised Decree with the changes highlighted; we briefly discuss them

12  below.

13      The modifications made remove any question that the Decree will mandate that "a full

14  continuum of special education and related services is provided for students with disabilities

15  at sites as close to the home of such students as possible," including the District's special

16  classes, centers and schools for students with disabilities.  Language within the conditionally-

17  approved Decree to which parents testified in opposition was deleted.  (Decree, pp. 13-14)

18  ("Over a period of time, integrate the District's 18  special education schools, reduce the

19  number of the District's segregated sites. . . .")  While it was never the intent of the parties

20  to eliminate such sites as part of the availability of options, the following provisions were

21  added to dispel any doubts:

22      I.    <u>Recommendations Relating to the Provision of a</u>

23          <u>Full Continuum of Special Education and Related</u>

24          <u>Services in the Least Restrictive Environment.</u>

25  The District shall:

26      1.    Ensure that a full continuum of special education and

27  related services is provided for students with disabilities at sites

28

-18-

as close to the home of such students as possible.   The continuum of program options shall include all of the following:

a.   General education classrooms with appropriate supplemental supports and services.

b.   A resource specialist program pursuant to California Education Code Section 56362.

c.   Designated instruction and services pursuant to California Education Code Section 56363.

d.   <u>Special classes and centers pursuant to California Education Code Section 56364.  The District's special schools are part of the continuum of program options.</u>

e.   Nonpublic, nonsectarian school services pursuant to California Education Code Section 56365.

f.   State special schools pursuant to California Education Code Section 56365.

g.   Instruction in settings other than classrooms where specially designed instruction may occur pursuant to California Education Code Section 56361.

To meet the foregoing obligations, the District shall develop and implement programs and services to students with disabilities that increase opportunities for them to attend school at general education sites;

(Revised Decree, pp. 17-18 (emphasis added).)

Provisions were also added to assure that families of students with disabilities and District personnel be informed as to when children might be in need of special education and the range of services available:

G.   Recommendations Relating to Parent Participation.

The District shall provide families of students with disabilities with the information they need to effectively support the education of a child with disabilities.   This includes providing clear explanations to help parents: (a) know when their child might be in need of special education; (b) better understand the nature of their child's disability and educational needs; (c) effectively participate in the development of their child's IEP; (d) know the full range of services available; and (e) ensure the full and meaningful participation of parents in the decision making process concerning the appropriate and least restrictive placement for their child with disabilities on an annual basis. The District shall provide to parents a written description of the placement options and support services available to students with disabilities prior to any IEP meeting.

H.   Recommendations Relating to Staff Development.

The District shall in-service the Board of Education; the Superintendent, all administrators, and all other certificated and classified personnel on the legal and professional obligations to students with disabilities under the law on a regular basis. All appropriate District employees shall be informed of and knowledgeable concerning these legal and professional obligations.   The District shall also conduct orientation programs for new personnel and annual training and other in-service on special education matters as required by law. The District shall ensure that administrators and teachers have input in the design of staff development programs for District personnel.  The District shall also make positive efforts to ensure that individuals with exceptional needs and parents of such individuals are involved in the design and implementation of staff development programs.

\*   \*   \*

2.      Develop and implement policies, procedures, and programs that provide for a full continuum of education opportunities and which include the full and meaningful participation of parents in the decision-making process concerning the appropriate placement for the individual student. All appropriate District employees shall be informed of and knowledgeable concerning these policies, procedures and programs.

(Revised Decree, pp. 16-17, 18, 19.)[3]

The parties added a new mandate designed to eliminate obstacles to the enrollment of students with disabilities on general education campuses:

O.      Recommendation Relating to the Educational Environment and Students with Disabilities.

The District acknowledges that it has a legal obligation to eradicate educational environments throughout the District that are hostile to students because of their disabilities, and shall take all steps necessary to fulfill that obligation.

(Revised Decree, p. 28.)

The Revised Decree responds to the testimony calling for meaningful public participation in the implementation and monitoring process by the formation of a Community Planning Committee, consisting of parents, teachers, administrators, and representatives of organizations serving individuals with disabilities, and to be chaired by the Consent Decree Administrators or their designees. (Revised Decree, pp. 45-46.) The parties further provided that the Community Planning Committee be divided into specified committees "tasked with assisting in the development of the particular implementation plans . . . required to return the District to compliance." (Revised Decree, p. 47.) The chair of each subcommittee was required to be a parent of a child with a disability attending school in the District. (Revised Decree, p. 48.) Sub-committees will address the following issues, among others:

---

[3] Revisions of language in the original Decree are highlighted by shading in this and subsequent excerpts.

(1)     Least Restrictive Environment;

(2)     Inter-agency responsibilities pursuant to AB 3632;

(3)     Nonpublic Schools;

(4)     Compliance and Monitoring;

(5)     Special Education Services to ethnically diverse, non-English or limited English speaking students;

(6)     Staff Development;

(7)     Learning Disabilities;

(8)     Visual and Hearing Impairments;

(9)     Disability awareness; and

(10)    Behavior intervention.

(Revised Decree, pp. 47-48.) The Decree was also amended to permit individual parents the opportunity to challenge implementation plans when plaintiffs' counsel do not challenge the plan where it can be shown that "the challenged implementation plan is not reasonably calculated to return the District to compliance in the particular area addressed by the implementation plan." (Revised Decree, pp. 60-61.)

As previously examined, the conditionally-approved Decree was carefully tailored to cause the District to come into compliance with applicable federal laws and regulations. The parties inserted a preamble and other provisions to emphasize this result. (Revised Decree, pp. 1-3, 17.) We quote to this end the most pertinent provisions of the Preamble:

## PREAMBLE

The parties to this Consent Decree recognize that federal and state law mandate that children with disabilities have access to a free and appropriate education in the least restrictive environment. For many children with disabilities and their families who live in the Los Angeles Unified School District obtaining this education has been confusing, difficult and at times, even impossible. This Consent Decree represents the promise of the Board of Education of the Los Angeles Unified School District to bring the District's

-22-

special education program into compliance with federal law.  In furtherance of this commitment, this Consent Decree will ensure that:

(a)    Parents are provided with timely information concerning services so that they can be full participants in the educational decisions affecting their children.

(b)    Obstacles to children with disabilities being educated on general education campuses are eliminated.

(c)    Children with disabilities will have access to appropriate education services and supports.

(d)    All timelines established by law for conducting assessments and delivering services are met.

(e)    A full continuum of special education programs is provided and each child with a disability has access to education in the least restrictive environment.

(f)    The Individualized Education Programs of children with disabilities will be implemented in a timely manner.

(g)    All District officers and employees are knowledgeable concerning their obligations under the law.

(Revised Decree, pp. 1-2.)

On March 14, 1996, after making a few additional revisions to the Decree to enlarge class members' opportunities to make objections to proposed implementation plans, to provide notice of these plans and to facilitate joint efforts by the parties to secure funding for compliance efforts required, the Board approved the Decree by a 6 to 0 vote, with one member abstaining.  (See Exhibit 3.)

ARGUMENT

I.   **A CONSENT DECREE IS REVIEWED TO DETERMINE WHETHER THE SETTLEMENT ACHIEVED IS FUNDAMENTALLY FAIR, ADEQUATE AND REASONABLE**

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action settlement agreement requires district court approval. According to the Ninth Circuit Court of Appeals, a consent decree is reviewed under a "universally applied standard" to determine whether the settlement is "fundamentally fair, adequate and reasonable." Davis v. City and County of San Francisco, 890 F.2d 1438, 1444 (9th Cir. 1989), citing Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). On appeal, the standard for appellate review is limited to an abuse of discretion. Davis, 890 F.2d at 1445. Indeed, "[a]n appellate court will reverse approval of a consent decree 'only upon a strong showing that the district court's decision was a clear abuse of discretion.'" Id. (quoting Officers for Justice, 688 F.2d at 626).

The primary purpose for the court approval requirement is to protect interests of class members who may not have received due consideration by those negotiating the settlements. Davis, 890 F.2d 1444 n.5; Officers for Justice, 688 F.2d at 624.

The Ninth Circuit in Davis, 890 F.2d at 1445, has also explained the manner by which a fairness analysis is to be carried out:

> In deciding whether a consent decree is fair, adequate and reasonable, the district court must balance several factors, including but not limited to: strength of the plaintiffs' case; risk, expense, complexity nd possible duration of continued litigation; relief offered in settlement; extent of discovery already completed; stage of proceedings; experience and views of counsel; governmental participation; and reaction of the class members. The degree of importance attached to each factor is determined by the nature of the claim,

1     the type of relief sought and the facts and circumstances of each case.   Id.
2     (citation omitted).

3          Thus, a "district court's determination is nothing more than 'an amalgam of delicate
4     balancing, gross approximations and rough justice.'"   Officers for Justice, 688 F.2d at 625
5     (quoting City of Detroit v. Grinnell Corp., 495 F.2d 488, 468 (2d Cir. 1974).

6          [T]he court's intrusion upon what is otherwise a private consensual agreement
7          negotiated between the parties to a lawsuit must be limited to the extent
8          necessary to reach a reasoned judgment that the agreement is not the product
9          of fraud or overreaching by, or collusion between, the negotiating parties, and
10         that the settlement, taken as a whole, is fair, reasonable and adequate to all
11         concerned.   Therefore, the settlement or fairness hearing is not to be turned
12         into a trial or rehearsal for trial on the merits.   Neither the trial court nor this
13         court is to reach any ultimate conclusions on the contested issues of fact and
14         law which underlie the merits of the dispute, for it is the very uncertainty of
15         outcome in litigation and avoidance of wasteful and expensive litigation that
16         induce consensual settlements.   The proposed settlement is not to be judged
17         against a hypothetical or speculative measure of what might have been achieved
18         by the negotiators.

19    Officers for Justice, 688 F.2d at 625 (emphasis in original).   See also United States v. State
20    of Oregon, 913 F.2d 576, 581 (9th Cir. 1990) ("[A] consent decree need not impose all the
21    obligations authorized by law. . . . The court need only be satisfied that the decree represents
22    a 'reasonable, factual and legal determination.'"   (citations omitted).)

23    II.    THE CONSENT DECREE IS FUNDAMENTALLY FAIR

24         The Consent Decree before the Court easily meets the Ninth Circuit's test of
25    fundamental fairness, adequacy and reasonableness.   Far from a close call, it represents the
26    most comprehensive overhaul of any school district's delivery system for special education
27    services ever accomplished in the nation, achieved here in record time thorough cooperative
28    enterprise by the parties in place of stubborn and costly adversariness.   Guided by the

Consultants' conclusion that the LAUSD was clearly liable for massive and systemic violations of federal laws and regulations controlling the provision of special education, the Decree reflects the parties' accord that each and every area of non-compliance identified shall be redressed.  No recommendation by the independent expert consultants has been ignored or rejected by either party.  To the contrary, the mechanism selected to secure compliance -- acceptance of the detailed recommendations, and the development of implementation plans collectively formulated by experts, District personnel, parents and other interested parties -- assures that the broad special education community will be meaningfully involved in all phases of the process.  Perhaps most significantly, the parties have also agreed in the Decree to procedures for monitoring progress in attaining compliance such that the LAUSD must comply with the law as determined by independent experts, and remain in compliance for three consecutive years, before the jurisdiction of the Court over the District and the subject matter of the litigation shall terminate.

The hallmark of this Decree is compliance with the law.  Within its provisions, this objective is repeatedly spelled out; the language and directives of the law are tracked throughout.  The single task given the Consultants by the parties was to identify where the District was out of compliance and recommend how compliance could be gained.  The Decree serves this end.  We attach as Exhibit 4 to these papers court-approved consent decrees in related cases across the country; by comparison, the Decree in this case is far more specific and comprehensive as to the relief required and the implementation procedures to be invoked.

Finally, the process for reaching agreement selected by the parties has been inclusive of class members, and deliberately so to maximize the knowledge and experience of parents and students familiar with the District's practices.  No undertaking of this breadth and ambition could find credibility otherwise.  Notice and outreach to class members and their families about the conditionally-approved and revised decrees, and the opportunity to critique publicly and to counsel, and to advocacy groups acting on their behalf, was widespread.  All reasonable measures to inform the class were applied.  As a result, thousands of parents and

1   community members responded with thoughtful concerns and criticism. Public participation

2   was robust and constructive.

3          Most significantly, the input was heeded. The draft Decree underwent tangible and

4   substantial alterations as consequence of the class members' comments. Its authorship

5   genuinely goes far beyond any set of attorneys in the case.

6          The Decree is more than reasonable. It is a carefully-crafted document, possessing

7   credibility on both sides of the case, representative of the best opportunity available to

8   guarantee that no child in the LAUSD will be denied the free, appropriate public education

9   that the law and our common devotion to the realization of the potential of each child

10  mandate.[4]

---

24  [4] We have reviewed papers to be filed by the Board in support of the Decree responding

25  to comments received by the public. We generally concur with the District's response.

26          In addition, after Board action on the revised Consent Decree on March 14, 1996,

27  the parties received comments from the United States Department of Education. The Department of Education, after its review of the entire document, concluded that only one

28  area warranted comment. Its comment, and plaintiffs' reply, are set forth in Exhibits 5 and 6. See Declaration of Robert M. Myers.

1

## III

2

## CONCLUSION

3        For the foregoing reasons, the motion for approval of the Consent Decree should be

4   granted.

5   Dated:  March 18, 1996                    Respectfully submitted,

6                                             ROBERT M. MYERS
                                              VALERIE VANAMAN
7                                             Newman.Aaronson.Vanaman

8                                             MARK ROSENBAUM
                                              SILVIA ARGUETA
9                                             ACLU Foundation of Southern California

10                                            CATHERINE BLAKEMORE
                                              SANDRA PETTIT
11                                            Protection & Advocacy, Inc.

12
                                By:    _Mark Rosenbaum by S.A._
13                                            MARK ROSENBAUM
                                              Attorneys for Plaintiffs
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE BY MAIL

I, SUSAN M. SIMPSON, declare:

I am a resident of the County of Los Angeles, California; that I am over the age of eighteen (18) years of age and not a party to the within-entitled cause of action; that I am employed in the County of Los Angeles, California; and that my business address is 1616 Beverly Boulevard, Los Angeles, California 90026.

On March 18, 1996 I served a copy of the attached document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE CONSENT DECREE** on the parties of record in said cause by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

BARBOSA GARCIA & BARNES
BONIFACIO BONNY GARCIA
LORIE A. CAMPOS
500 Citadel Drive
Suite 390
Los Angeles, CA 90040-1575

I am readily familiar with the office's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed on March 18, 1996, at Los Angeles, California.

*Susan M. Simpson*
SUSAN M. SIMPSON